JOHN D. GROVE *vs.* WILLIAM H. FRESH.—*December*, 1837.

Under the act of 1820, ch. 161, upon a bill filed on the 23d of June, 1835, if the *subpœna* is returned served to the then ensuing July term, and the defendant does not appear, an interlocutory decree may pass against him, and an *ex parte* commission issue to prove the allegations of the bill.

Upon the return of the commission, the bill is not to be taken *pro confesso* against such defendant; though if there be also a non-resident defendant, against whom an order of publication has been passed, it is indispensable

to a final decree that the bill should be taken *pro confesso,* as against the latter, the proof under the commission not being binding upon him.

Multifariousness in a bill must be taken advantage of by demurrer, and it is no excuse for not having presented the objection in that form, that the defendant had not appeared in court at the proper time, after having been summoned to do so.

The copy of a contract between private persons and the Chesapeake and Ohio Canal Company, is not evidence, though signed by its clerk, and though the company upon application refuse to suffer the parties interested to have the original to return under the commission.

A decree which directs the payment of money, without actual or constructive proof of its receipt by the party directed to pay it, or of its loss by his negligence or misconduct, is erroneous.

And where it was shown that the defendant had received a certificate of debt from the Canal Company, in December, 1833, or January, 1834, and the bill which assumed its payment to him was filed in June, 1835, it was held to be too short a time to make the presumption, so as to charge him personally.

Upon a bill for an account, filed by one partner against his co-partners, after the termination of the partnership, all the parties are regarded as actors, and the decree must settle the partnership concerns as if each partner was a complainant, filing a bill against his co-partners.

The claims of the complainants and the defendants, and of the defendants, *inter se,* must all be determined.

*Quere.*—Whether a decree would be reversed, which merely settles the rights of the complainant and defendants, when the latter had not appeared in the Court of Chancery before the decree, and consequently filed no exceptions to the accounts of the auditor, upon which the decree was based.

Appeal from *Chancery.*

On the 23d of June, 1835, *William H. Fresh* filed his bill in Chancery, alleging that he, with a certain *John Stocksdale,* entered into a partnership, for the purpose of obtaining a contract and constructing a section of the *Chesapeake and Ohio Canal;* that a contract was accordingly entered into between *Stocksdale* in his own name, and the Canal Company, for the construction of the 147th section thereof; it being agreed between the appellant and appellee that *Fresh* should be considered a dormant partner; that soon after the contract was entered into, the parties agreed to take in another partner, a certain *Joseph Ward,* who became a member of the partnership; and that they all carried on the work for their joint benefit, under the name, however, of *Stocksdale* and *Ward* only;

that after they had been some time engaged, *Stocksdale* sold all his interest in the concern to *John D. Grove*, with the consent of the appellee and his partner, *Ward;* and that they by an arrangement with the company, and all the other parties concerned, put *Grove* in the place of *Stocksdale.* The bill then alleged, that the section was completed by the appellant and appellee and said *Ward;* that as the work progressed, *Grove* from time to time received therefor large sums of money from the Canal Company, which were paid to him as the contractor with the company, for the benefit of the partnership; that besides the said sums, there was on final settlement between the company and the said *Grove,* found due to the said section $2,711 68, and that a certificate, dated in January, 1834, was issued by the said company for the above sum, with interest, to the said *Grove;* that the money in the said certificate has been received by the said *Grove,* and appropriated to his own use; and that he has also converted to his own use certain personal property of the partnership, enumerated in the bill, and that complainant furnished materials in the business of the partnership, for which he has not been allowed; that a settlement was asked of *Grove,* which he refused to enter into with complainant. Prayer for a discovery of the partnership effects, and an account; for a *subpœna* against *John D. Grove,* and an order of publication against *Ward,* who was a non-resident, and for general relief.

A *subpœna* accordingly issued for *Grove,* and an order of publication was passed against *Ward.*

On the 5th August, 1835, and at the July term of the Chancery Court, *Grove* having been returned summoned, the usual decree was passed as against him, declaring that the complainant was entitled to relief, and ordering a commission to take proof, for the purpose of showing its extent. On the same day a commission was issued, proof was taken, the substance of which sufficiently appears in the opinion of this court. Proof was offered of the contract between the Canal Company and *Stocksdale.* The cause was then referred to the auditor, who reported two accounts, one against the ap-

pellant in favor of the appellee, for a balance of $1,153 41, and the other against *Ward*, also in favor of the appellee, for $190 72. The former account assumed upon the proof of *Lorenzo Ambrose*, taken under the commission, that *Grove* was liable, as having received the sum due on the final settlement of January, 1834, from the Canal Company.

At December term, 1835, the Chancellor ,(*Bland*) decreed that the bill of complainant should be taken *pro confesso;* that the report of the auditor should be confirmed; and that the defendants should respectively pay the complainant, or bring into court, the sums reported to be due by the auditor, with costs.

From this decree *Grove* appealed.

The cause was submitted on the written arguments of the solicitors for both parties, to BUCHANAN, Ch. J. STEPHEN, ARCHER, DORSEY, and CHAMBERS, Judges.

PRICE, for the appellant.

The whole case below, from beginning to end, having been proceeded in, heard, tried, and determined, in the absence of *Grove*, the court will require the complainant to make out his case according to strict law. It will take nothing for granted in his favour. No answer being filed, there was no issue in the case, and nothing therefore can be supplied by intendment, or by legal admission, on the record.

My first objection is, that these proceedings were a little too summary.

By the act of 1820, ch. 161, sec. 1, when a *subpœna* is returned, summoned, against a defendant, who shall fail to appear according to the exigency of the writ, the court may enter an interlocutory decree, and issue a commission for taking testimony to support the allegations of the bill, and upon the return of the commission, the court shall proceed to a final decree in the cause in the same manner as if the defendant had appeared and put in his answer.

By the 2d section, whenever such bill shall charge any

matter, as being within the private knowledge of the defendant, and shall pray a discovery on oath, as to such matter, and the plaintiff shall satisfy the court, on oath, taken in open court, that such matter does rest in the private knowledge of the defendant, and there is reasonable grounds to believe that such matter does exist, the court may take the bill *pro confesso*, and proceed to a final decree.

By the act of 1832, ch. 302, sec. 3, when a defendant, of full age, shall be returned *non est* upon *two successive subpœnas*, the court may order publication of the substance of the bill against the defendant, as if he were a *non-resident*, and as if the case made in the bill were within the acts relating to non-residents, provided that each of said *subpœnas* were delivered to the sheriff, or other officer, at least twenty days before the time to which such *subpœna* was returnable.

Now the question is, what did the legislature intend by the act of 1820? Did they intend, that no matter how short a period before the return day, a *subpœna* may be issued, or be served upon the defendant, if he fail to appear *at* the return, a commission may go out *instanter*, and upon its return, in one hour thereafter, a final decree may be passed, and the defendant be precluded forever from making any defence? Or did they intend that he should have a reasonable opportunity of being heard?

In this case, as we have seen, the bill was filed on the 23d of June, and on the 5th of July following, an interlocutory decree was passed, reciting that *Grove* had been summoned and had failed to appear. The whole interval between the filing of the bill and the date of the decree, is twelve days. Supposing the *subpœna* to have been mailed the day after the bill was filed, it would then take it two days, or it might be three, according to the course of the mail, to reach *Hagerstown*. Then it might be a week before the sheriff found it convenient to seek out *Grove* and serve the writ. Thus, from eight to ten days were almost necessarily consumed before the defendant could have had notice that a suit had been instituted against him. *Grove* then had from two to

four days at most, within which to ascertain what the suit was about—to employ counsel—and for that counsel to appear. And here it will be remembered, that the suit was brought in a court situated one hundred and ten miles from the residence of the defendant. If, therefore, the time given in this case, be considered reasonable, then, one hour would be as good as the whole time allowed him.

But the legislature have given an explanation of their intention on this point, by the act of 1832, above referred to. By that act a defendant cannot be rendered liable to a decree by publication against him, until two *non ests*, which necessarily require *two terms*, and each *subpœna* is required to be in the hands of the officer, at least twenty days previous to each return day. Having provided these guards against surprise by the act of 1832, can it be possible, that by the act of 1820, which merely provides a different mode of doing the same thing, it could be intended, that a final decree might be had against a citizen, before he could by any diligence, secure an appearance, or file his answer?

If the rules of the court of Chancery do warrant such proceedings, those rules are against the spirit of the act of 1820, and ought to be reformed. With such rules to work with, it would be the easiest thing imaginable, so to contrive matters, as in every case to deprive a party of his defence. I do not, however, intend to intimate the possibility of any such contrivance in this particular case.

2d OBJECTION.—By the decree of the chancellor it is adjudged and decreed, that the bill be taken *pro confesso.* This is wrong. By the act of 1820, ch. 161, sec. 1, already referred to, the chancellor is authorized, upon the return of the *ex parte* commission, to proceed to a final decree in the cause, *in the same manner as if the defendant had appeared and put in his answer.* Now a bill is never taken *pro confesso* when the party has answered. The 2d section of the above act, provides that in certain particular cases under that law, the bill may be taken *pro confesso,* but this is not one of those cases.

·. In reply to this objection it may be said, that admitting the objection to be valid, it does not alter the result.    But I have a right in a case like this, to insist upon all the forms. Admitting the chancellor's right to hang *Grove,* I only insist that he shall not drown him.

3d OBJECTION.—The bill is vicious and demurrable for multifariousness.    The bill is professedly filed by one person against two others, all of whom had been partners, for the purpose of having an account of the partnership transactions. In such a case the chancellor has an undoubted jurisdiction; but the bill, after stating in what manner the two defendants wrongfully applied the partnership assets to their own use, proceeds to allege, that *Grove,* one of the defendants, " did also convert to his own use a horse and cart which belonged to your orator alone."    And this same horse and cart are made an item of charge in the auditor's account, thus, " To one sorrel horse and cart, the property of *Fresh,* taken by *Grove* and converted to his own use, $85."    Whereupon, the chancellor passes his decree for the whole, including the horse and cart.

Upon this point, I refer to the following authorities : *2d Red. Tr. Pl.* 181, *and note (b) ibid.    Brookes vs. Ld. Whitworth,* 1 *Mad. Rep.* 86, 88, *and note (d) ibid.    Salvidge vs. Hyde,* 5 *Mad.* 138.    *S. C. on Appeal,* 1 *Jac. Rep.* 151.

In *Salvidge and Hyde,* 1 *Jac. Rep.* 151, a bill for an account of a testator's estate, and also to set aside sales made by the executor and trustee to himself, and to another person, held multifarious.

In *Brooks vs. Ld. Whitworth,* 1 *Mad. Rep.* 86, the bill was against several distinct purchasers and others, and held multifarious.

In *Cooper's Eq. Pl.* 182, it is said, " that the court will not permit several plaintiffs to demand by one bill, several matters perfectly distinct ; nor one plaintiff to demand several matters of distinct natures against several defendants."    Again, 183, *ibid,* " even when joint and separate demands were joined in one bill, a demurrer was allowed."

Grove *vs.* Fresh.—1837.

In *Davoe vs. Fanning,* 4 *John. Ch. Rep.* 199, the attempt was to blend together a demand by the plaintiff as legatee, against the defendant as executor, with a demand of the plaintiff in his private capacity, against the defendant in his individual character; and the bill was dismissed with costs. See what the chancellor says in the same case, p. 204. The last is this case exactly.

It may be urged that the objection to a bill for multifariousness, must be taken advantage of by demurrer, and cannot be made at the hearing. The law thus stated is admitted, but in this case the defendant having been deprived of the opportunity of making any defence, cannot be held to have waived this or any other objection. If a defendant submits to answer a bill on its merits, he is very properly held to have waived all objections which go merely to the form of proceeding, but in the absence of any defence whatever, there can be no waiver.

*4th* OBJECTION.—The contract between *Stocksdale* and the Canal Company, if any such there be, is not established by legal proof. It is attempted to be established by exhibiting a paper, purporting to be a copy of such contract, signed by *John P. Ingle,* clerk, &c. and then by adducing two witnesses, who, *looking at the copy,* say it is a true copy. The points under this objection are,

1. That the original ought to have been produced. See *Gurley's Eq. Ev.* 100.

2. The original ought to have been produced, and when produced ought to have been proved, there being no express or implied admission of its execution under interrogatories in the common form, viz. " Look upon the paper writing here shown you at this, the time of your examination, marked with the letter A, was the same, at any and what time, signed, sealed and delivered by any, or what person or persons, in your presence." See *Gurley's Eq. Ev.* 98.

3. The copy here adduced is a mere nullity. The law on this subject is well stated in *Gurley's Eq. Ev.* 106, 107, from which I make the following extracts:

" When an officer is especially authorized to make out copies, not by the law, but by the court, these are the common office-copies of which so constant an use is made in equity. In all courts they are admitted for convenience, in the cause to which they belong, and are in fact, so far, equivalent to the record itself."

Here I remark, that this doctrine is given in relation to a judicial record, when if the original is produced it proves itself, and does not require any additional proof, as in case of a deed, of its execution.

Again : " If a person in an official situation makes out a copy and signs it, without having any especial authority to do so, there is no advantage whatever gained ; he must appear and swear to it like any other individual."

Again : " If no exemplification or properly authenticated copy has been procured, *a copy sworn to have been examined with the original,* is admitted in proof of a record.  Here, as in proving statutes, the witness must swear that he has either compared it line by line, or that he has looked over it while the original was being read aloud."

It will be seen by reference to the charter of the Canal Company, (*act of* 1824, *chap.* 79, *sec.* 3, 4,) that the powers and duties of the clerk of that company are not specified.   The 4th section merely gives power to the president and directors to appoint a clerk.

There is nothing said in *Gurley's* treatise of the admission of copies of private documents ; from which it may be inferred, that such mode of proof is inadmissible.   See page 118.

For these reasons I hope the decree will be reversed, and the defendant admitted in the court below, to make his defence.

DULANY, for the appellee :

The first objection urged to the decree of the chancellor, in the above argument, is, that under the true construction of the act of 1820, ch. 161, sec. 1, the proceedings in the Chancery Court were too summary, and hurried on with illegal precipitancy.

The facts stated as the ground-work of this objection, are, that the bill was filed on the 23d of June, 1835, and on the 5th of July following the interlocutory decree was passed. The answer to this objection is, that in *point of fact* there is no ground for it. The interlocutory decree was made not on the 5th of July, but on the 5th of August, if the copy of my record which is now before me is correct, and I think it is; for the commission, which the record says was issued on the same day, is dated on the 5th of August. See record, pages 7 and 8.

If then the whole case was tried and determined in the absence of *Grove*, that absence was wilful, and continued after full notice and ample opportunity to appear and be heard, if, indeed, he had any thing to urge in his own defence.

But even if the facts were such as have been supposed, the interlocutory decree of the chancellor would have been fairly warranted by the act of 1820, the 1st section of which provides, among other things, that when the *subpœna* shall be " duly returned summoned," and the defendant " shall fail to appear according to the exigencies of the writ, or having appeared, shall fail to answer," &c. then the chancellor is not only " authorized," but "required," on application made to him, to enter an interlocutory decree, and issue a commission *ex parte*, &c. These words of the statute are too clear to admit of doubt. The time when the interlocutory decree is required to be passed by the chancellor, is expressly declared to be, when the defendant shall fail to *appear* according to the exigency of the writ; then, and upon that default, if applied to, the chancellor cannot choose, but is constrained to act by the imperative terms of the law; there is no obscurity to be illustrated by a reference to other laws, especially to the act of 1832, ch. 302, sec. 3, which has a very different object in view, from the law of 1820. The 3d section of the act of 1832, was intended to afford the same means of bringing persons before the court who are citizens of the state, but actually out of the state, as was before usually had against all non-residents; hence it directs that upon the return of " *non est*"

on two successive *subpœnas*, it shall be lawful for the court to order publication of the substance of the bill, &c.; the object of which is, to give *notice* to the defendant that he may appear.     How different is the 1st section of the act of 1820, which in the provision of it now under discussion, pre-supposes not only that the defendant had notice, but that he was duly returned summoned, and wilfully refused to obey the commands of the court; and for this default, and as soon as it occurs, the defendant renders himself obnoxious to an interlocutory decree; and such exactly was the predicament of *Grove,* had been duly returned summoned, and had failed to appear in obedience to the writ; an interlocutory decree was entered against him, a commission issued, testimony was taken under it, and a decree finally passed on the 1st December, 1835. What just reason has *Grove* to complain of the precipitancy of these proceedings, when he might, at any time between the 10th July and the 1st December, have appeared and been fully heard in his defence.

The 2d objection is urged against the final decree, on the supposition that it takes the bill *"pro confesso."*   It is true, that the decree does take the bill *"pro confesso"* in terms, but it does not disregard the evidence returned with the commission; on the contrary, it is founded on the consideration of the evidence.   It recites that the chancellor had considered all the proceedings, of which the testimony was a part; it also ratifies the report of the auditor, which is professedly grounded upon the proof taken in the cause, and which is of a character amply sufficient to sustain the decree itself.   So that the same, and no more effect, has been given to the testimony than if the defendant had appeared and put in his answer. The adjudication then, in the decree, that the bill should be taken *"pro confesso,"* are mere words of form, inasmuch as the allegations of the bill have been all substantiated by proof, and the case actually decided by the chancellor upon its merits.

But if the objection should prevail, the court I apprehend will go no farther than to reform the decree, by striking out

the objectionable part of it, and then proceed to pass such a decree, in form and substance, as the chancellor ought to have passed. For I cannot agree with the counsel for the appellant, that his client will be entitled to have a total reversal and entire opening of the decree, because the case was tried below in *his absence,* for that was his own default, which surely cannot entitle him to peculiar favour.

The 3d objection of the appellant is made to the multifariousness of the bill.

Without admitting the truth of this objection, which it is not necessary to discuss, it cannot now prevail, for it comes too late, and advantage could only be taken of it by demurrer, before answer, and not at the hearing. This is admitted in the argument of the appellant ; but it is said in this case there was no answer. It is urged that "the defendant having been *deprived* of making any defence, cannot be held to have waived this, or any other objection."

The error of this argument consists in assuming as a fact, that *Grove* was *deprived* of making his defence. On the contrary, every opportunity was afforded him for that purpose ; he was summoned, and refused and neglected to appear ; that he did not make a defence, therefore, was no *deprivation,* it was an act of choice, and at the same time an act of disobedience to the court. Can he obtain by this contemptuous conduct the advantage of urging an objection of a formal character at this time, which would not have belonged to him if he had regularly appeared and answered. General principles certainly forbid that a defendant should be thus favoured, as the consequence of his negligence and misconduct. Besides the act of 1820, in the 1st section of it, which contemplates a decree against a defendant who had not appeared or answered, gives to that decree the same effect as if he had regularly appeared and answered. It appears to me then entirely clear, that *Grove* cannot look behind the decree, which has the same effect against him as if he had put in his answer, to bring forward his objection to the multifariousness of the bill, if indeed it be multifarious ; for this would be *in effect* to take the

objection *after* answer, which it is admitted on all hands could not be done.

5th section of the act of 1832, ch. 302, also forbids any decision upon the insufficient averments of the bill to which exceptions had not been made in the court below.

4th objection of the appellant is, that the contract between *Stocksdale* and the Canal Company, is not established by legal proof.

This objection, which in fact is merely formal, comes too late—by the 5th section of the act of 1832, already cited, this court is peremptorily forbidden " to notice, act upon, or determine any objection to the competency of witnesses and the admissibility of evidence, unless it shall plainly appear in the record that such point had been raised by exceptions in the Chancery court," &c.

The question involved in this 4th objection, is purely and only a question of the admissibility of evidence, and it is therefore too clear for argument, that under the above act, it cannot be made for the *first* time in this court, and there is every thing in the record to shew that it never was raised in the court below.

But if the question of the evidence of the contract of *Stocksdale* with the Canal Company, could be considered open to discussion, it would be no difficult task to shew that the testimony in the record, is both competent and sufficient to establish the existence of that contract.

In the deposition of *Stocksdale's* 2d answer, page 12, it is stated that " Exhibit A, is a true copy of the contract entered into between the deponent and the *Chesapeake and Ohio Canal Company,*"

This is positive legal proof of the truth of the copy, and implies that the witness had the means, and used them, of making the requisite comparison of the copy with the original.

A certificate of a copy of a record, under seal, and which is every day used as evidence, never states that the copy was compared with the original, but certifies simply that the copy

is a true one, a comparison by which the truth is ascertained, being of course implied, though not stated—and so it is where the truth of a copy is proved by the oath of a witness, instead of a seal. Exhibit A then, is a true copy of the original contract, and the question then is, whether as a copy it can be admitted as evidence in this cause; and I think it can, as the original could not be produced. Formal application was made for it, (at the request of the appellee, by *John Carrere, Esq.*) that it might be returned with the commission as evidence in this cause, of the Canal Company, through their secretary, *John P. Ingle:* that body acting through the same medium, refused to give up the original agreement, but offered to furnish a copy.

This letter, in refusing the original contract, evinces that it was as much out of the power of the party to produce it in this cause, as if it had been lost or destroyed. For he resorted to petition and request, which were the only means in his power to obtain it, and his petition and request were denied, and the body who gave this denial, are extra-territorial, and cannot be reached by the compulsory process of any of the courts of this state—there is no other alternative but to take the copy in the place of the original. The principle is a sound one, and applicable here, that where the best evidence cannot be had, that which is secondary and inferior, must be resorted to.

But suppose this contract is altogether excluded from the consideration of the court, as inadmissible evidence, such exclusion will not, I apprehend, affect the decree of the chancellor. Because, independent of this agreement with the Canal Company, there was a verbal contract of co-partnership, between *Ward, Grove, & Fresh,* by which, they were jointly to complete the 147th section of the canal, and were among themselves to share equally in the profits and expenses of the work. This contract was carried into execution. The work was finished by the partners, and *Grove,* for their joint labours, received the entire compensation; and the

claims of *Fresh* now is, for his share of the profits of the work, which the evidence shews to have been $2,000.

Whether the contract of *Stocksdale* with the Canal Company, therefore, is proved or not proved, is I think immaterial, as the contract of co-partnership, and that the work was done under it by *Fresh, Ward, & Grove*, and that *Grove* received the whole amount of the compensation money from the Canal Company, are all facts, distinctly and fully proved. These facts being established, they afford ample ground for the decree of the chancellor, throwing out altogether the contract of *Stocksdale* with the Canal Company, for in truth it does not bear upon the merits of the present controversy. We seek to recover under a distinct contract, and upon facts which shew that *Grove* received money for our use as well as for his own, and has retained the *whole* for himself.

DORSEY, Judge, delivered the opinion of the court :

The first objection to the decree is, that the proceedings upon which it is founded were too summary. However severely the expedition with which this cause was brought to a final decree may operate upon the appellant, it was warranted by the acts of assembly, under which the proceedings were had, and therefore forms no ground upon which this court can reverse the decree.

The second objection is equally untenable. It urges the reversal of the decree, because it decreed that the bill be taken *pro confesso.* That part of the decree by which the bill was adjudged to be taken *pro confesso,* was only intended to operate against the defendant *Joseph Ward,* against whom publication as a non-resident had been duly made; and as against him, it was indispensable to a final decree in the cause. The testimony taken under the commission being admissible only against *Grove,* and in no wise binding the interests of *Ward.*

To the third objection no greater weight can be given. It alleges multifariousness in the bill of complaint. Whether that allegation be true or false is wholly immaterial, it being

conceded by the solicitors on both sides, that such a defect can only be taken advantage of by way of demurrer. But it is insisted, that the appellant never having appeared in the Chancery court until after the final decree, could not have used this defence before that tribunal, and should not therefore be denied its benefit before this court. This excuse gives to the appellant no such right. A court of equity extends no favours to those who are in default in disobeying its process. Had the appellant appeared in obedience to the mandate of the court, the defence now set up could not have been denied him, but having failed to do so, the consequences of his delinquency are justly visited upon him.

The fourth objection, which seeks to exclude the copy of the canal contract, introduced as evidence under the *ex parte* commission, is well taken if before the proper tribunal; on which question we mean to express no opinion. But concede the inadmissibility of the proof objected to, it is by no means certain that the other testimony in the cause does not render unnecessary the proof objected to ; but whether it does or does not, we do not design to decide, as this case will be remanded to the court of Chancery, where in all probability the question will never arise.

Although the decree of the chancellor is not reversed for any of the reasons assigned, there is to it a fatal objection, arising under the testimony in the cause. The appellant has been decreed to pay to the appellee the one-third part of two thousand dollars, the alleged net profits of the partnership transactions, without its being proved that any portion of that amount was ever received by him. The only evidence tending to show such a receipt, is that of *Ambrose*, who states that *Grove* informed him "that he had had a settlement with the Canal Company, and had obtained a certificate for two thousand seven hundred and eleven dollars, sixty-eight cents, bearing date the latter part of December, 1833, or the 1st of January, 1834." Until this money has been actually or constructively received, or has been lost, by the negligence or misconduct of *Grove*, no decree against him predicated upon

its payment can be made. The bill was filed in less than eighteen months after the settlement took place, which is too short a time to raise a presumption of payment, sufficiently strong to render *Grove* personally answerable for the amount, and there was nothing in the nature of the settlement that imposed on him such a responsibility. The decree of the chancellor, therefore, is erroneous in so charging him. It is also erroneous on another ground, though perhaps one for which, on the present appeal, it could not be reversed. Yet as this case must be remanded for further proceedings in the court of Chancery, it is proper that we should suggest it, that it may be remedied by the final decree of that court. In a bill for an account, filed by one partner against his co-partners, after the termination of the partnership, all the partners, as well defendants as complainant, are regarded as actors, and the accounts must be stated by the auditor, and the concerns of the partnership and rights of the several partners finally adjudicated upon by the chancellor, in the same manner as if each partner was a complainant, filing a bill against his co-partners. The chancellor would not otherwise finally adjudicate upon the whole case before him. Such was not the course of proceedings adopted in this cause. The audit was made, and the decree passed, simply upon the claims of the complainant against the defendants, his co-partners, leaving the claims of the defendants as between themselves wholly undetermined.

This court will sign a decree, reversing without costs the decree of the chancellor, and remanding this cause to the court of Chancery, that such further proceeding may be had therein, as may be necessary to a final decree upon the rights of all the parties, according to their respective equities.

CAUSE REMANDED.